UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAVID SELL,                                    **DECISION AND ORDER**
                                               **No. 6:10-CV-6182(MAT)**
                    Petitioner,

        -vs-

JAMES T. CONWAY,

                    Respondent.
_____

## I.    Introduction

Pro se petitioner David Sell ("Petitioner") has filed a
petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254
challenging his detention in state custody. Petitioner is
incarcerated as the result of a judgment entered against him on
September 12, 1997, in New York State Supreme Court, Erie County
(Rossetti, J.) following a jury verdict convicting him of second
degree (intentional) murder in the second degree (New York Penal
Law ("P.L.") § 125.25(1)); second degree criminal possession of a
weapon (P.L. § 265.03); and first degree reckless endangerment
(P.L. § 120.25). He was sentenced to an aggregate sentence of
43½ years to life.

## II.   Factual Background and Procedural History

### A.    Overview

The charges against Petitioner stem from a shooting on
October 21, 1995, which resulted in the death of Sheldon Newkirk
("Newkirk") and minor injuries to Gerald Webb ("Webb"). Over
defense objection, the trial court granted the prosecution's motion

to amend the indictment on July 23, 1997, to include a theory of
accomplice liability under P.L. § 20.00, based upon the findings
that Newkirk's body contained bullets fired from two different
guns.

**B.   The Trial**

A summary of the relevant trial testimony follows.

**1.   Gerald Webb**

Prior to the shooting, Webb had known Petitioner for about
three or four years. About two years prior to this incident, they
had had a falling out because Petitioner had made some remarks to
Webb that angered him. T.81.[1] Webb and Sell had a physical fight
over Petitioner's comments.

On the night of Friday, October 20, 1995, Webb went to a party
on Boehm Street with his girlfriend, Elizabeth Hernandez
("Hernandez"); his sister, Michele Bailey ("Bailey"); and his
sister's boyfriend. Also present were Virgil Williams ("Williams")
and Webb's good friend, Newkirk. T.50-51. In the early morning
hours of October 21st, Webb left the party to go to the convenience
store on Genesee and Bailey Streets. T.52. He was accompanied by
Hernandez, Newkirk, Bailey, and Williams. As they were crossing the
street, "a car pulled up and tried to hit [them]." T.52. Webb
delivered a kick to the car and asked the driver (Petitioner),

---

[1]
Numerals preceded by "T." refer to pages from the transcript of
Petitioner's trial.

-2-

Case 14-2400, Document 2, 07/09/2014, 1267937, Page3 of 44

"what the hell was wrong with him". T.52. As Petitioner drove away, he said, "I'll be right back." T.52, 53.

Webb and his friends continued on to the store. As they were heading back down Boehm Street, Petitioner "flew by [them] in the car." T.54. When Webb and his companions got back to 29 Boehm, he saw Petitioner turn the corner onto Warring Street. Petitioner got out of the car and started coming back across the street towards them carrying a chrome pistol. T.57. Webb believed it was a pistol rather than a revolver because he did not see a round barrel. T.57. There were about three men with Petitioner when he first started walking across the street, but they "went other directions", leaving Petitioner by himself. T.57. According to Webb, Petitioner was "twirling" the pistol in his right hand as he walked up to the bottom of the steps of the porch. T.57.

Newkirk told Bailey and Hernandez to go upstairs and said to Petitioner, "[A]in't no need for no guns." Newkirk grabbed Webb, and they both turned to go into the house. T.58. That is when Petitioner started shooting at Webb and Newkirk. T.58. Webb was able to get to the door first; he looked around and saw Sell pull the trigger and shoot Newkirk. T.59. As Webb stumbled on the steps, bullets kept brushing his leg and his hands. The only injury he suffered was a laceration on his right hand from being grazed by a bullet. T.60.

-3-

When the shooting finally stopped, Webb ran upstairs to get a towel so that he could tend to Newkirk, who was not responsive by that point. When Webb returned to Newkirk's side, Sell was gone, the car he had arrived in was gone, and the people who had gotten out of Sell's car were gone. T.78.

Webb eventually learned about another shooting in the vicinity at around the same time: Michael Ridgeway, a guest at the same party on Boehm Street, had been shot by his brother, Terry Ridgeway, out in the street. Webb learned about the Michael Ridgeway shooting when he was in the patrol car going to give a statement. T.66. Webb denied that he knew the Ridgeway brothers, and maintained on cross-examination that he did not know them or anything about their reputation on the street. T.69, 81. Neither Webb nor any of his companions had a firearm that night. He did not see anyone shooting back at Petitioner or any of "these people in the street." T.64.

Defense counsel impeached Webb with inconsistencies between his trial testimony and his statement to the police. See T.70 et seq. Webb admitted that there was no reference to his having kicked Sell's car. T.71. Webb only described the weapon as a handgun; he did not indicate whether it was an automatic or what color it was. Id. Webb claimed that he told the police it "was like a silverish color chrome gun", but his statement did not reflect that. T.72. Webb further admitted that the part about Sell coming down the

-4-

street twirling the gun was not contained in his statement to the police. Id. Webb conceded that it was not until a year and two months later that he told this story again to the prosecutor at the grand jury. T.73. Webb claimed that he "was in shock" when he first reported the incident. Id. On re-direct, the prosecutor pointed out that the statement commenced at the point of the narrative when Petitioner approached the porch where Webb and Newkirk were standing. T.84.

When asked to clarify his testimony about the other individuals who got out of the car with Petitioner, Webb stated that Petitioner was the only one coming in his direction. T.74. Webb did not know where the other individuals were. T.75. Although his statement to the police indicated that the other individuals "jumped out of the car and started shooting[,]" Webb claimed that he did not remember telling the police that. T.75. Webb stated these other people pulled around the corner, parked the car, got out and "[t]hey just started–[Petitioner] started walking towards us. Where the rest of them went I don't know. I know where [Petitioner] was at." T.75.

### 2. Gordon Maston

Twenty-two-year-old Maston met Petitioner at the end of 1992, while they were both incarcerated. T.116. Maston considered Sell a friend, and the two had not had any disputes. T.117. On the night of the incident, Maston was walking by himself towards 29 Boehm

-5-

from his sister's house on Bailey Street when he saw Petitioner "with a chrome gun shooting upon on the porch" and "somebody on the side of the porch" also shooting at people on the porch. T.119. Maston said the gun "could have been a chrome .380" or a "chrome nine" but he did not know for certain. T.119; T.139. Maston recalled that Petitioner "looked [him] dead in the face", turned away, and began shooting at the people on the porch. T.120. Maston related,

> After I saw him shoot, . . . I'm looking at him shoot, I just couldn't believe, you know what I'm saying, I was seeing him doing that. So, I got behind the tree because somebody was on the side of the street shooting too. When the firing ceased I walked back up the street to my sister's house.

T.121, 135. As Maston was approaching the corner of Bailey and Boehm, Petitioner was sitting his car. They looked at each other, and said, "[W]hat's up[?]" T.121. Petitioner replied, "[']I just bodied a nigger, I got to bounce.[']" Id.; see also T.136. Maston thought Petitioner meant that he had just killed somebody. Id. Before Maston could reply, Petitioner sped away in what Maston described as a red Acura Integra, a "little compact car." T.122, 137. Maston did not know where the Acura was parked during the shooting. T.137. There was one other male black in the car with Petitioner, whom Maston could not identify because he did not see his face. T.138. Maston had not consumed any alcoholic beverages or drugs that night, and recalled that the area was well-lit due to the street lights.

-6-

Case 14-2423 Document 2 07/09/2014 1367937 Page 7 of 44

Maston claimed that he did not know the identities of the other people who were with Petitioner when he arrived on Boehm Street. Maston did see one other person shooting besides Petitioner, but Maston said, "I can't describe him. He was dark. . . . [Petitioner] is light, you know what I'm saying. The other character was dark skinned. Then he was on the side of the house behind the rail." T.132. Maston did not know who the second shooter was, and he did not give a description of him to the police or prosecutor. T.134. He did not see what kind of gun the other shooter had because he "wasn't paying attention to that" and it was dark on the side of the house where the person was, and so Maston could not see his face. T.139.    Maston testified that he had heard of the Ridgeway brothers and their conviction for a murder about twenty-five years ago, based upon a news story he watched. T.135.

Maston admitted that he did not contact the prosecutor about his having witnessed the murder until 1997; he claimed that he waited to do so until Petitioner was caught, which was the "proper time." T.126. Maston admitted that he contacted his attorney to have the attorney contact the prosecutor on his behalf about the Petitioner case after he (Maston) had been indicted on a robbery charge. T.127. Maston admitted that he had a pending robbery charge that arose from an incident involving his ex-girlfriend, explaining that he wanted to take his car out of her name, and that she gave

-7-

him the title, but then "called the cops and said that [he] took [his] title at gunpoint." T.122-23. While that case was pending, Maston advised the district attorney's office that he had witnessed the Newkirk/Webb shooting on Boehm Street. Maston testified that despite providing information regarding Petitioner's prosecution, he nevertheless was indicted for the robbery involving the car title. T.123. He testified on cross-examination that he received "[n]o deal." Id.; see also T.130 (Q: "You're not expecting to receive any benefit from this [i.e., testifying against Petitioner]?" A: "No, I'm not.").

### 3. Gail Buchanan

Thirty-one-year-old Gail Buchanan ("Buchanan"), who lived at 70 Warring on the date of the shooting, was friends with Newkirk, the murder victim. On the night of October 20th, Buchanan went to a party hosted by Gail Borum ("Borum") at 77 Warring. T.145. Buchanan said that Petitioner and Morrow were at the party. At some point, one of the speakers blew, and so Petitioner and Morrow left to go get new ones. T.148-49. They were gone for about 30 to 45 minutes. Id. Buchanan heard their car arriving back at the party but said, but they never came back in the house. Buchanan looked outside the door and saw Petitioner, who "seemed like he was upset and he was saying he was going back around the corner. Someone told him let that shit go, it's not worth it and he was like no, I'm going back around there." T.149. Buchanan went back into the house

-8-

to use the bathroom. Upon hearing gunshots, she returned outside to see that everyone had left the house. She looked down towards the corner of Warring and Boehm where all she could see was "just a big commotion." T.149, 154. She then went across the street to her house to check on her kids. Id. Buchanan testified that she heard approximately four or five shots fired. T.155. Buchanan said that she did not know the Ridgeway brothers and did not know whether they were at the party at Borum's house. T.151.

### 4. Adrian Morrow

Morrow had met Sell on the street about eight months prior to the shooting. T.157. At Borum's party on October 20th, he and Petitioner, along with Fred Parsons ("Parsons") and a person named "Klee", left to go pick up some speakers at Morrow's house at 260 Percy. On the way back, Petitioner got into an argument with three guys on the corner because "[a]pparently somebody kicked the car." T.160. Morrow did not see anyone kick the car. Petitioner got out and "was arguing" with the guys on the corner. Then Petitioner got back into the car, and they drove down Boehm and turned onto Warring. Id. They popped the trunk, and Morrow removed a speaker and brought it into the house. When he returned, everyone had gone. Gunshots rang out around the corner, so Morrow ran in that direction. T.161.

Once at Boehm, Morrow saw Newkirk lying down on the porch. Sell was shooting "up in the air . . . [l]ike at the top of the

house." T.161. Morrow testified that he heard "a lot of shots" before he got to the corner. Sell was firing a chrome-colored pistol. T.162.

According to Morrow, Michael Ridgeway was there, although he was still standing at the time Morrow arrived on the scene. T.163. Terry Ridgeway and Petitioner's friend, "Klee", both had handguns, but Morrow did not actually see them shooting. T.174. Neither Parsons nor Michael Ridgeway had guns. T.178,

At some point during the incident, Morrow saw Michael Ridgeway fall to the ground. He first thought Michael Ridgeway was "playing 'cause he was drunk." T.163.  Morrow grabbed Michael Ridgeway's arm, pulled him up, and that is when he saw blood coming from the back of his head. Id. Petitioner, Terry Ridgeway, and "Klee" all left, but Morrow did not know where they went. T.164. Morrow described himself as "hysterical" by that point.

Morrow admitted that he had been convicted of third degree assault in 1992, for which he received a probationary sentence. Three years later, he was convicted of attempting resisting arrest. Most recently he had pled guilty to a drug charge in federal court. T.165. By the time he came forward in Sell's case, he had already been indicted and pled guilty in federal court. The prosecutor asked Morrow, "And according to federal law you're locked into a specific sentence, is that not true?" T.165. Morrow replied, "Yes." T.165. On cross-examination, Morrow admitted that his sentencing

-10-

hearing had been adjourned, although he claimed not to know the reason for the adjournment. T.179-80. Morrow denied that he entered into a cooperation agreement with the United States Attorney's Office "so that he could get a better deal for himself." T.180. Morrow admitted knowing that the federal prosecutor had submitted a request on July 8th to adjourn his sentencing that had been scheduled for July 11th but claimed not to know the reason for the adjournment. Defense counsel marked the adjournment motion as an exhibit (Defendant's Exhibit D) for identification purposes. T.180. Morrow claimed that although his attorney had shown him the papers submitted on his behalf and dealt with by the attorney in federal court, Morrow had never seen the letter from the prosecutor marked as Defendant's Exhibit D. T.182. Morrow said, "I don't know why [it was adjourned]. My lawyer just called me and said that it was adjourned to August 15." T.183. The trial court interjected, "That's enough. You don't know why. Next question." T.183.

### 5. Virgil Williams

Twenty-two-year-old Williams was dating Webb's sister and had known Newkirk for about six months prior to the shooting. Williams did not know Sell and had no prior dispute with him. T195-96.

As Williams, Webb, Bailey, and Hernandez were on their way back from the store to Newkirk's house, "a car came speeding around the corner and we was [sic] walking in the middle of the street and it almost hit us." T.196. They started "yelling at the car or at

-11-

the driver of the car slow down, watch where you [sic] going."
T.197. The driver "backed up and he was like, what you say[?]"
T.197. They repeated what they said—"slow down, watch where you
[sic] going, you almost hit us." Id. The driver replied, "I'll be
back" and pulled away, making a left turn at the next corner onto
Warring, and then got out of the car and came back. T.197, 213.
Williams identified Sell in court as the driver of the car, having
identified him officially for the first time at the grand jury
T.197, 215.

Williams and his friends had not quite made it to 29 Boehm
when he saw Sell "come back around the corner by his self [sic]
with a gun in his hand." T.197-98. According to Williams, the gun
was definitely a black pistol, not a revolver. T.198, 216. It
appeared to Williams that Sell was twirling the gun in his hand.
Id. Williams "guess[ed]" the pistol "would be a nine or something
like that," meaning a 9mm. T.215. Williams went up to Newkirk's
house to alert his friends that Sell was approaching.

On cross-examination, defense counsel confronted Williams with
his statement to the police immediately after the shooting.
Williams stated that he told the police the shooter was 5'10"-tall,
with thick eyebrows, a slight goatee, and a light complexion.
T.208. However, the statement says "black male, light skinned,
medium build, box haircut grown out, five ten, thin mustache, dark
jeans, colored shirt with light stripes going across it. T.209.

-12-

(Sell is only 5'5"-tall. T.210).  When Sell got to the bottom of
the stairs to the porch, he stood there holding the gun and "was
making threats like watch you [sic] all say to me. Now, what's your
problem." T.199. Newkirk said, "There is no need for no [sic]
guns." T.199.

At that point, Williams opened the door and told the girls to
go upstairs. Williams related that Newkirk and Webb were standing
side by side. Webb was "like yelling" at Sell" and was "a little
more madder [sic]" than the others because he was the closest to
being hit by Sell's car. T.199. Williams grabbed Webb, but Webb
"snatched away" from him. T.200. Williams looked at Newkirk who
"was like[,] 'I got this.'" <u>Id.</u> Williams thought that meant Newkirk
knew Sell because "they were talking and I'm feeling, you know, as
though Sheldon might have got the situation at hand." T.200.
Williams then proceeded to go upstairs. When he got to the top, he
heard about six shots. Returning downstairs, he saw Newkirk lying
in the doorway.

### B.    The Verdict and Sentence

The jury returned a verdict finding Sell guilty of Newkirk's
murder, of recklessly endangering Webb's life, and of criminal
possession of a weapon, as charged in the amended indictment. He
was sentenced as a second violent felony offender to an aggregate
term of imprisonment of 43½ years to life.

-13-

## C.    The Direct Appeal and State-Court Collateral Motions

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed Petitioner's conviction on direct appeal. People v. Sell, 283 A.D.2d 920 (4th Dep't), lv. denied, 96 N.Y.2d 867 (2001).

On August 5, 2002, represented by attorney Gregory McPhee, Esq. ("Attorney McPhee"), Sell filed a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, claiming that the prosecution failed to disclose cooperation agreements entered into with Maston and Morrow whereby they would receive favorable treatment in pending criminal matters in exchange for their assistance in prosecuting Sell. Sell also alleged that Maston and Morrow testified falsely in connection with these agreements, and that the prosecutor failed to correct their testimony.   Sell further argued that trial counsel provided ineffective representation on numerous grounds. The trial court denied the motion as without merit, and did not conduct an evidentiary hearing.

A justice of the Appellate Division granted leave to appeal the denial of C.P.L. § 440.10 relief, and assigned counsel Randall Unger, Esq., perfected the appeal. The Appellate Division unanimously affirmed the trial court's decision without discussion in a summary order entered October 3, 2008.

-14-

In a second C.P.L. § 440.10 motion dated March 18, 2009, which he filed pro se, Petitioner contended that the counts of murder and reckless endangerment should have been submitted to the jury in the alternative, trial counsel was ineffective in failing to object to the allegedly erroneous jury instructions in this regard, and in failing to use the grand jury minutes to renew a motion to dismiss the indictment. After the trial court denied relief, the Appellate Division denied permission to appeal by an order dated March 12, 2009.

### D.   The Federal Habeas Petition

This timely habeas petition followed in which Sell raises six claims, each of which Respondent admits was raised either in his direct appeal or in a subsequent collateral attack. Petitioner submitted a reply brief in response to Respondent's opposition papers and, subsequently, filed a letter-motion to stay the petition. Respondent opposed the motion to stay, which was denied without prejudice by the Court (Payson, M.J.) on March 30, 2012. Petitioner did not re-submit his motion to stay. On June 28, 2013, the Court (Payson, M.J.) granted Petitioner's request to supplement the petition with the transcript of Maston's state-court plea minutes. On May 16, 2014, the matter was transferred to the undersigned. For the reasons that follow, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.

## III. Merits of the Petition

### A. Ground One: Violation of the Equal Protection Clause in the Prosecutor's Use of Peremptory Strikes

#### 1. Background

Sell argues that the prosecutor violated the Equal Protection Clause because he had an improper discriminatory purpose in peremptorily striking a male Hispanic juror, Luis Irene ("Irene"). Sell himself is Hispanic. The prosecutor explained that he was striking Irene because

> [e]very question he's asked is with – has been [answered] with a smirk, a shake of the head. He just doesn't seem serious at all. Even when the Court was asking him questions and I know it's not portrayed in the record, but certainly the Court was observing of the carefree nature that this person has been answering the questions in this case . . . .

JS.133-34.[2] As Respondent points out, neither defense counsel nor the trial court expressed disagreement with the prosecutor's observations.

On direct appeal, Petitioner's only argument for a finding of pretext was that the prospective juror's ties to individuals in the law enforcement community typically would have resulted in a peremptory challenge by the defense, not the prosecution. The Appellate Division noted that "[t]he findings of the trial court, which was in the best position to view the prospective juror's

---

[2]
        Numerals preceded by "JS." refer to pages from the transcript of jury selection.

demeanor, [we]re to be accorded great deference." <u>Sell</u>, 283 A.D.2d at 921 (internal citations omitted). The explanation offered by the prosecution–"that the prospective juror had revealed himself to be a glib or unserious person–[was] race-neutral and not pretextual." <u>Id.</u>

### 2.   Analysis

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the Supreme Court established adopted a three-step burden-shifting approach for determining whether peremptory challenges have been used in a discriminatory manner. <u>See</u> 476 U.S. at 93-98. First, the movant must establish a <u>prima facie</u> case of discrimination; second, the non-movant must then provide a neutral justification for the peremptory challenge; and, third, the trial court must evaluate whether the movant has satisfied his ultimate burden of establishing that the peremptory challenge was the result of "purposeful discrimination." <u>Id.</u>

Here, the state courts applied the correct analytical framework in considering and ruling on defense counsel's objection to the peremptory strike. After defense counsel made his motion, the trial court asked for a non-discriminatory basis for excluding the juror. The prosecutor then articulated a facially race-neutral explanation for his challenge. <u>See</u> <u>United States v. Biaggi</u>, 853 F.2d 89, 96 (2d Cir. 1988) ("The [trial] court found . . . that several of those [prospective jurors] excused by the government had

displayed angry, arrogant, or flippant demeanors that led the government to be concerned that they might be insufficiently serious about jury duty and perhaps even disdainful of the judicial process."). After hearing the defense's rebuttal, the trial court nevertheless found the prosecutor's proffered non-discriminatory reason to be credible and ruled that it was nonpretextual.

At issue here is step three of the <u>Batson</u> analysis, which requires a trial court to make "an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." <u>United States v. Alvarado</u>, 923 F.2d 253, 256 (2d Cir. 1991). "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006) (quoting <u>Elem</u>, 514 U.S. at 768). The determination at step three is a finding of fact that is accorded "great deference" and reviewed for clear error on direct appeal; "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." <u>Hernandez v. New York</u>, 500 U.S. 352, 364-65 (1991). When the race-neutral explanation given is in turn based on the demeanor of the juror, the trial judge's 'first hand observations' are of great importance." <u>Thaler v. Haynes</u>, 559 U.S. 43, 49 (2010) (quoting <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477 (2008)). Thus,

habeas relief is warranted only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge." <u>Rice</u>, 546 U.S. at 338-39 (applying 28 U.S.C. § 2254(d)(2) as the standard of review in a <u>Batson</u> claim alleging error at step three).[3]

The prosecutor's assertion that Mr. Irene appeared "glib" and "not serious" about the jury selection process is not contradicted by any evidence in the record. Notably, defense counsel did not offer any rebuttal to the prosecutor's assertion regarding Mr. Irene's demeanor. As Respondent points out, Petitioner's only argument (which was not raised before the trial court) for a finding of pretext is that the prospective juror's ties to individuals in the law enforcement community typically would have resulted in a peremptory strike by defense counsel.

Background factors that are ordinarily viewed as favorable to the prosecution–e.g., a personal relationship with law enforcement–have been considered by New York State courts in determining whether a <u>prima facie</u> case of discrimination has been shown, <u>see</u>, <u>e.g.</u>, <u>People v Rodriquez</u>, 211 A.D.2d 275, 278 (1st Dep't 1995). Given the procedural posture of Petitioner's <u>Batson</u> challenge, the Court is no longer concerned with whether a <u>prima facie</u> case was established, because the prosecutor offered a

---

[3]

This review focuses on the state trial court's factual determination, even where, as here, there is a state appellate court opinion addressing the claim on direct review. <u>See</u>, <u>e.g.</u>, <u>Rice</u>, 546 U.S. at 338-39.

-19-

neutral reason for the strike, and the trial court ruled on the ultimate issue of discrimation. See Johnson v. California, 545 U.S. 162, 168 (2005) ("'If a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'") (quoting Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam)). In any event, the plausibility of the prosecutor's reason might be undermined if Sell could show that the prosecutor had kept other, non-minority jurors who possessed background factors typically associated with a bias in favor of the prosecution. Jordan v. Lefevre, 293 F.3d at 587, 594 (2d Cir. 2002). This, however, Sell has failed to do.

### B.   Ground Two: Erroneous Denial of Motion to Remove a Sworn Juror

#### 1.   Background

After being impaneled, a juror contacted the trial judge to disclose that he had served 8 years as a Justice of the Peace at least 10 years earlier. The juror had not revealed that fact during his voir dire, explaining that he had forgotten it until after he had left court that day. In moving to discharge the juror, defense counsel stated that, if he had known earlier of the juror's background, he would have exercised a peremptory challenge to discharge the juror. The trial court denied the request to remove the juror.

-20-

On direct appeal, appellate counsel argued that the juror was grossly unqualified to serve. The Appellate Division found this claim to be unpreserved[4] and without merit. The Appellate Division further held that trial court had properly denied the defense motion to discharge the impaneled juror.

### 2. Analysis

A trial judge's determination regarding a juror's impartiality is a factual determination. E.g., Thompson v. Keohane, 516 U.S. 99, 111 (1995) (citation omitted). As this "determination is essentially one of credibility, and therefore largely one of demeanor," "the trial court's resolution of such questions is entitled . . . to 'special deference.'" Patton v. Yount, 467 U.S. 1025, 1037-38 (1984) (quotation omitted).

Here, defense counsel did not claim that there had been "deliberate concealment" by the juror regarding his service as a Justice of the Peace. The juror came forward as soon as he remembered his omission and informed the court and counsel. When questioned by the trial court and counsel, the juror repeatedly and unequivocally assured the court that nothing in his background, including his service as a Justice of the Peace, would affect his ability to be impartial. It is noteworthy that defense counsel essentially conceded that there was no basis to challenge this

---

[4]

Respondent has not asserted the affirmative defense of procedural default based upon the Appellate Division's reliance on the contemporaneous objection rule to deny the claim.

juror for cause. See JS.213-14 (Defense counsel stated, "Is he grossly unqualified? The answer is probably not. Is he unqualified? Can I challenge him for cause? Probably not."). Rather, defense counsel merely asserted that he would have exercised a peremptory challenge had he known about the juror's stint as a Town Justice. Furthermore, defense counsel opted not to seek the juror's removal on the ground that he had "a state of mind that is likely to preclude him from rendering an impartial verdict based upon the evidence," N.Y. CRIM. PROC. LAW § 270.20(1)(b). Nor did defense counsel argue that the juror's answers during voir dire revealed actual or potential bias. Sell has failed to demonstrate that the trial court's finding regarding this juror's impartiality and ability to serve amounted to error, much less "manifest error," Patton, 467 U.S. at 1031, 1037-38.

**C.   Ground Three: Due Process Violations by the Prosecutor**

Petitioner raises two violations of Brady v. Maryland, 373 U.S. 83 (1963), in his petition. One pertains to a cooperation agreement between Morrow and the United States Attorney's Office ("the USAO"), and the other relates to a cooperation agreement between Maston and the Erie County District Attorney's Office ("the ECDAO").

### 1. The Cooperation Agreement With Morrow

#### a. Background

On April 18, 1997, prior to the commencement of Sell's trial, Morrow pled guilty in federal court to possession of five grams of cocaine with intent to distribute. Morrow signed a plea agreement, the terms of which were explained to Morrow as follows by the district judge: "You will cooperate with the prosecution, you will give it complete and truthful information as to your knowledge of all criminal activity by you and others in the area of dealing in dealing with and using drugs." Affidavit of Gregory McPhee, Esq. dated August 5, 2002 ("8/5/02 McPhee Aff."), Submitted in Support of C.P.L. § 440.10 Motion, at 7 (quoting Transcript of Morrow's Plea Allocation ("Morrow Plea Tr.") at 2, attached as Ex. C to the 8/05/02 McPhee Aff.). The district judge informed Morrow that if the cooperation he gave to the Government was "of sufficient help to it, it will make a motion . . . allowing [the judge] to reduce that level of criminality by a certain amount, and that of course will reduce the two figures that will control [Morrow's] time of imprisonment." Id. at 8 (quoting Morrow Plea Tr. at 7). Morrow's sentencing was scheduled for July 11, 1997.

On July 8, 1997, however, the Assistant United States Attorney Christopher Buscaglia ("AUSA Buscaglia") moved for, and was granted, a 30-day adjournment because Morrow was cooperating "in accordance with a Cooperation/Plea Agreement entered into between

the government and himself," but Morrow's "cooperation was incomplete." See Ex. B to the Petition (Docket No. 1).[5]

On October 17, 1997, Morrow and his attorney appeared in district court for sentencing. Morrow's attorney joined in the USAO's downward-departure motion, claiming that Morrow's "testimony . . . eliminated the alibi defense that was being put forward by Defendant David Sell." See Transcript of Morrow's Sentencing dated 10/17/1997 ("Morrow's Sentencing Tr.") at p. 3, Ex. C to the Petition (Docket No. 1). AUSA Buscaglia stated that the information Morrow had provided about drug-trafficking was not substantial enough, standing alone, to warrant the downward departure. However, the drug-related intelligence, combined with Morrow's testimony at Petitioner's trial, justified the 5K.1 motion. The district judge granted the motion and sentenced Morrow to a term of 57 months (4 years and 9 months).[6]

### b.  The Elements of a Brady Claim

In Brady, 373 U.S. 83, supra, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused

---

[5]
It appears that Petitioner's trial counsel, Alan Goldstein, Esq. ("Attorney Goldstein") obtained a copy of the federal prosecutor's July 18, 1997 request for an adjournment, since he cross-examined Morrow with a document dated July 18, 1997, which he stated was a request by the federal prosecutor to adjourn Morrow's sentencing.  Defense counsel marked the motion as  Defendant's Exhibit D for identification purposes, but it was not entered into evidence because Morrow testified that he did not recall seeing it.

[6]
Without a downward-departure, the mandatory minimum sentence for the crime to which Morrow pled guilty was 10 years.

upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Supreme Court has explained that "[t]here are three components to a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Green, 527 U.S. 263, 281-82 (1999). As the Second Circuit has noted, "[u]nquestionably agreements in general terms to reward testimony by consideration create an incentive on the witness' part to testify favorably to the State and the existence of such an understanding is important for purposes of impeachment." DuBose v. LeFevre, 619 F.2d 973, 979 (2d Cir. 1980) (citing Boone v. Paderick, 541 F.2d 447, 451 (4th Cir. 1976)), cert. denied, 430 U.S. 959 (1977)).

### c. Analysis

When asserted the claim regarding Morrow in his C.P.L. § 440.10, Justice Rossetti ("the § 440 court") acknowledged that Morrow had a "federal plea deal" but found that it was "not subject to disclosure" under Brady because the agreement, as memorialized in the federal plea transcript, "required him only to assist the authorities with respect to drug activity[,]" and contained "absolutely no reference" to Petitioner's prosecution. See First

C.P.L. § 440.10 Order at 7. The § 440 court found that although Morrow "certainly benefitted" from testifying against Petitioner, as evidenced by AUSA Buscaglia's statement that Morrow's cooperation with the ECDAO was the main basis for the downward-departure motion, such cooperation "was not a condition of [Morrow's] federal plea agreement and therefore not subject to disclosure." Id. The § 440 court also found that Petitioner had "failed to demonstrate that the District Attorney knew, or should have known, that Morrow had an agreement with the federal prosecutor." First C.P.L. § 440.10 Order at 6-7. That factual finding of prosecutorial ignorance is binding on this Court unless [Petitioner] can demonstrate by clear and convincing evidence, see 28 U.S.C. § 2254(e)(1), that it was erroneous." Afrika v. Herbert, 2007 WL 2323500, at *17 (W.D.N.Y. Aug. 10, 2007) (citing Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003); Simmons v. Fisher, No. 02 Civ. 4811(SHS)(MH), 2006 WL 2129770, at *11 (S.D.N.Y. July 26, 2006)). Even assuming that Petitioner had shown by clear and convincing evidence that the prosecutor had actual or constructive knowledge of a cooperation agreement, the Court nevertheless finds that Petitioner has failed to establish a true Brady violation, as discussed further below.

"Brady cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records and 'defense counsel should know of them and

fails to obtain them because of lack of diligence in his own investigation.'" United States v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997) (quoting United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995); further citation omitted). Respondent argues, as the ECDAO did in the § 440 proceeding, that Petitioner's trial counsel, Attorney Goldstein, was aware, based on Defendant's Exhibit D (i.e., the request for adjournment dated July 18, 1997), that Morrow had pled guilty in federal court and that his sentencing remained pending at the time of Petitioner's trial. In rebuttal, Attorney McPhee, Petitioner's motion counsel, noted that trial counsel Attorney Goldstein had stated that he had never been shown a copy of any cooperation agreement with Morrow. However, Attorney Goldstein did not acknowledge the existence of Defendant's Exhibit D, of which he certainly could have obtained a copy from Attorney Goldstein. Apparently because it had not been submitted in support of the § 440.10 motion, the § 440 court found that "without the benefit of [D]efendant's [E]xhibit D, [it] cannot conclude . . . that counsel had actual knowledge of the existence of a cooperation agreement, let alone its specific terms." First C.P.L. § 440 Order at 6. This Court notes that Attorney McPhee clearly was engaging in some amount of gamesmanship by not attaching a copy of Defendant's Exhibit D in support of Petitioner's C.P.L. § 440.10 motion or acknowledging its existence, although it certainly would have been in trial counsel Attorney Goldstein's possession.

-27-

Because Petitioner submitted a copy of the July 18th adjournment motion (Defendant's Exhibit D) in support of his habeas petition, this Court has had the opportunity to review it. The document clearly states that Petitioner's sentencing needed to be adjourned because he had not finished cooperating with the USAO. Based upon the Court's review of relevant case law, the adjournment motion gave Petitioner's trial counsel sufficient facts for him to have made further inquiry. See, e.g., United States v. Bermudez, 526 F.2d 89, 100 (2d Cir. 1975) ("[A]ppellant's counsel could, with due diligence, have discovered the existence of the alleged files. He was aware of pending state court proceedings against Fiffe, Miranda, Blanco and Juanita Guzman for dealing with state narcotics officers during the same period of the present conspiracy because he represented Guzman in that case. In view of that participation he was plainly in a position to subpoena whatever state files he now claims would have assisted preparation for cross-examination of Fiffe."). The law is well settled that "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense." United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978). Under these circumstances, the Court finds that trial counsel was on notice that Morrow had a cooperation agreement of some sort which may have warranted additional investigation. See

-28-

United States v. Zackson, 6 F.3d 911, 919 (2d Cir. 1993) (finding
that defendant "had sufficient access to the essential facts
enabling him to take advantage of any exculpatory material that may
have been available", and therefore the government did not suppress
information in violation of Brady) (citations omitted).[7] The Court
agrees with the Respondent's attorney that "[c]ounsel had the
information he needed to investigate and call witnesses if he
wanted more information about that agreement [mentioned in AUSA
Buscaglia's letter]." Second Meyer Aff. at 3, ¶11 (internal
citation to record omitted). See, e.g., Raley v. Ylst, 470 F.3d
792, 804 (9th Cir. 2006) ("Petitioner possessed the salient facts
regarding the existence of the records that he claims were
withheld. Petitioner knew that he had made frequent visits to
medical personnel at the jail. He knew that he was taking
medication that they prescribed for him. Those facts were
sufficient to alert defense counsel to the probability that the

---

[7]
     Zackson is similar to the present case in that the defendant claimed that
he was misled by a federal agent's affidavit into believing that a witness'
cooperation related only to one investigation. The agent's affidavit did not
reveal that the witness held a more expansive role as an informant; this
information emerged at a hearing where the agent testified. Zackson argued that
the information was "suppressed" because the government never notified him of the
hearing date, nor of the substance of the agent's testimony. The Second Circuit
noted that although Zackson might not have received prior notice of the witness'
hearing, "evidence in the record suggest[ed] that Zackson was nevertheless aware
that the issue of the extent of [the witness'] cooperation may have warranted
some additional investigation." Zackson, 6 F.3d at 919. The panel concluded that
Zackson had sufficient access to the essential facts enabling him to take
advantage of any exculpatory material that may have been available, including
[the agent]'s testimony at the . . . hearing on [the witness]'s motion to
dismiss." Id. Therefore, the court concluded, "the government did not suppress
the subject information in violation of Brady."

jail had created medical records relating to Petitioner. Because Petitioner knew of the existence of the evidence, his counsel could have sought the documents through discovery.").

Because this Court has found that there has not been "suppression" within the meaning of <u>Brady</u> it need not address the question of whether the state prosecutor, ADA Cooper, had actual or constructive knowledge of the cooperation agreement. Furthermore, it need not address "materiality". For the foregoing reasons, Sell's <u>Brady</u> claim involving the failure to disclose Morrow's cooperation agreement does not warrant habeas relief.

### 2.   The Cooperation Agreement With Maston

#### a.   Background

Prior to jury selection, the prosecutor, Assistant District Attorney Michael Cooper ("ADA Cooper") informed Petitioner's defense counsel that Maston had been convicted of seventh degree criminal possession of a controlled substance and had a pending second degree robbery charge. JS.11-12. ADA Cooper stated that "no deals or promises have been made to Gordon Maston." JS.13. Notwithstanding his information regarding Petitioner's involvement, the ECDAO "indicted him for a C violent felony anyway" and he "got no deal whatsoever . . . ." JS.14. Petitioner's defense counsel asked for confirmation that "there have been no promises made" to Maston regarding the second degree robbery charge, and ADA Cooper replied, "That is correct." <u>Id.</u> When asked to confirm that no other

matters or charges had been either terminated or discontinued or not prosecuted based on his cooperation, ADA Cooper replied, "Exactly. When I became aware of him as a witness he was indicted anyway for a Class C violent felony and that's it. No deals, no nothing. I went and tried to make consideration and the word from above was no and so he was indicted an no deal was given." JS.14.

At trial, Maston testified on direct examination about his pending robbery charge, explaining that his "girlfriend was angry" because he wanted to take the title of his car out of her name and put it in somebody else's name, and "she called the cops and said that [he] took [his] title at gunpoint." While that case was pending, Maston advised the ECDAO that he had witnessed the crime at 29 Boehm Street. Maston testified that he had received "[n]o deal" in exchange for being a witness against Petitioner. T.122-23. On cross-examination, Maston maintained that he was "not expecting to receive any benefit" from testifying against Petitioner. T.130.

Ultimately, Maston received a probation-only sentence in connection with the second degree robbery charge pending in Erie County Court. At sentencing n January 14, 1998, Maston's attorney's noted that Judge DiTullio had "[given] a commitment [of probation], and the reason for that commitment was the extraordinary cooperation with the district attorney's office." Judge DiTullio in fact imposed a 5-year probationary term, noting that although Maston had been the instigator in the robbery charge, he had

provided critical assistance to the ECDAO by "fully cooperat[ing]" in a "very serious case"–i.e., Petitioner's prosecution.

When Petitioner raised his <u>Brady</u> claim involving Maston in his C.P.L. § 440.10 motion, he supported it principally with Maston's sentencing transcript, the relevant excerpt of which is quoted above. Petitioner also argued that the transcript of Maston's bail hearing supported the existence of a cooperation agreement with the ECDAO. Maston, who allegedly was on probation at the time, received a relatively favorable bail, which Petitioner argued was suggestive of a cooperation agreement.

In denying the motion, the § 440 court found that "[t]he record establishe[d] that Maston's receiving a sentence of probation was at least partially the result of his assistance in the prosecution of the defendant." First C.P.L. § 440.10 Order at 4. However, "the evidence of a <u>quid pro quo</u> arrangement [was] purely circumstantial[,]" First C.P.L. § 440.10 Order at 4, and, in any event, "the existence of any such agreement was contradicted by the prosecutor's remarks on the record[,]" <u>id.</u> The § 440 court concluded that notwithstanding the "circumstantial evidence" of a "<u>quid pro quo</u> arrangement," Maston had "failed to demonstrate the existence of an understanding between" Maston and the ECDAO, "that in exchange for Maston's cooperation the People would offer a particular plea or make a sentencing recommendation, that County

-32-

Court would commit to a particular sentence, or that some other benefit would be conferred." First C.P.L. § 440.10 Order at 4.

### b. Analysis

In Shabazz v. Artuz, 336 F.3d 154 (2d Cir. 2003), the Second Circuit held that "[t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, provided that it does not promise anything to the witnesses prior to their testimony . . . ." Id. at 165 (emphasis in original). "[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony." Id. The issue is not whether the witness eventually received favorable treatment because he testified at the defendant's trial; rather, the "relevant inquiry" is whether the prosecution "made an undisclosed promise of additional leniency in exchange for [the witness]'s cooperation." Id.

Federal courts have held that the existence of a cooperation agreement between the prosecution and a witness is a factual determination entitled to a presumption of correctness on habeas review. See Shabazz, 336 F.3d at 162-63 (habeas petitioner did not present evidence sufficient to rebut presumption of correctness afforded state court factual findings in rejecting Brady claim regarding undisclosed promises of leniency to prosecution witness);

-33-

see also Matthews v. Ishee, 486 F.3d 883, 895-96 (6th Cir. 2007)).
Here, the trial court explicitly found that the existence of a
cooperation agreement was contradicted by the prosecutor's remarks
on the record, i.e., ADA Cooper's statement that when he became
aware that Maston was a witness against Petitioner, he "went and
tried to make consideration and the word from above was no and so
[Maston] was indicted [on a class C felony] and no deal was given."
T.14. Because Petitioner has not offered evidence to demonstrate
clearly and convincingly that the state court's findings of fact
regarding are incorrect, the Court finds that he has not
demonstrated the suppression of a cooperation agreement between
Maston and the ECDAO. See, e.g., Moore-El v. Luebbers, 446 F.3d
890, 900 (8th Cir. 2006); Wisehart v. Davis, 408 F.3d 321, 323-24
(7th Cir. 2005). This Brady claim accordingly is denied.

### D.    Ground Four: Ineffective Assistance of Trial Counsel

To succeed on a claim of ineffective assistance of counsel
under Strickland v. Washington, 466 U.S. 668, 686 (1984), a
petitioner has to show that his lawyer's conduct "so undermined the
proper functioning of the adversarial process" that the process
"cannot be relied on as having produced a just result."
Specifically, a petitioner must show that "(1) his counsel's
performance fell below an objective standard of reasonableness
under prevailing professional norms and (2) he was prejudiced by
counsel's deficient performance." Id.

-34-

Petitioner contends that trial counsel was ineffective because he failed to object to the jury instructions and to object to the allegedly inconsistent verdicts. On direct appeal, the Appellate Division summarily found that Petitioner received "meaningful representation".

The two errors that Petitioner assigns to trial counsel are fundamentally the same, inasmuch as they focus on the allegedly inconsistent mental states of the crimes charged. Accordingly, they lack merit for essentially the same reasons. The Court turns first to Petitioner's claim that trial counsel was ineffective in failing to object to the verdicts of intentional murder and reckless endangerment on the basis that they were legally inconsistent.

"A verdict is inconsistent or repugnant—the difference is inconsequential—where the defendant is convicted of an offense containing an essential element that the jury has found the defendant did not commit[.]" People v. Trappier, 87 N.Y.2d 55, 58 (1995) (citing N.Y. CRIM. PROC. LAW § 300.30(5) ("Two counts are 'inconsistent' when guilt of the offense charged in one necessarily negates guilt of the offense charged in the other[.]")). In order to determine whether the jury reached "an inherently self-contradictory verdict," a reviewing court must examine the essential elements of each count as charged. Id. (quotation and citations omitted).

Petitioner relies upon <u>People v. Gallagher</u>, 69 N.Y.2d 525 (1987), to argue that he cannot be convicted of reckless and intentional crimes based upon the same act. <u>Gallagher</u> held that a jury's finding that a defendant killed his victim with the intent to cause death is inconsistent with a finding that the same killing occurred recklessly and thus unintentionally. <u>See</u> <u>id.</u> at 529. Petitioner argues that because an act can be intentional or reckless, but not both, he cannot be guilty both of intentional and reckless conduct in regards to the shooting incident.

Although the criminal act here (the shooting) was the same for the intentional murder and the reckless endangerment counts, these counts entailed two distinct results and two different victims, unlike in <u>Gallagher</u>. To be guilty of first degree reckless endangerment, Petitioner must have recklessly created a grave risk of Webb's death. To be guilty of intentional murder, Petitioner must have specifically intended to cause Newkirk's death, and have acted to effect such death. In <u>Trappier</u>, 87 N.Y.2d 55, <u>supra</u>, the Court of Appeals held "[a] defendant could certainly intend one result—serious physical injury—while recklessly creating a grave risk that a different, more serious result—death—would ensue from his actions." <u>Id.</u> at 59. Here, Petitioner could have fired at Newkirk with the intent to kill him and, simultaneously, could have consciously disregarded a substantial and unjustifiable risk that, by so doing, he would create a grave risk of death to Webb, who was

nearby. Because the jury reasonably could have determined that Sell acted intentionally as to one result and recklessly as to a distinct, second result, the verdicts were not inconsistent. <u>See</u>, e.g., <u>People v. Williams</u>, 240 A.D.2d 441 (2d Dep't 1997) (repugnant verdict claim, although unpreserved, was in any event without merit "as it was possible for the defendant to have had two different mental states at two different times" and "it was not unreasonable for the jury to find that the defendant acted recklessly in shooting one victim and acted intentionally in shooting the other") (citation omitted). Therefore, an objection by trial counsel on the basis of repugnancy would not have succeeded, and Sell accordingly cannot demonstrate how he was prejudiced by counsel's decision not to do so. It necessarily follows that trial counsel cannot be found ineffective in failing to request that the intentional murder count and the reckless endangerment count should have been submitted to the jury in the alternative.

### E.    Ground Five: Prosecutorial Failure to Correct False Testimony

Petitioner argues that both Morrow and Maston testified falsely regarding their cooperation agreements with the USAO and the ECDAO, respectively, and that the prosecutor failed to correct the false testimony.

As the Second Circuit has observed it long has been the established law of the United States that "a conviction obtained through testimony the prosecutor knows to be false is repugnant to

the Constitution." <u>Shih Wei Su v. Filion</u>, 335 F.3d 119, 126
(2d Cir. 2003) (citation omitted).  "[T]he Supreme Court has not
deemed such errors to be 'structural' in the sense that they
'affect[ ] the framework within which the trial proceeds.'" <u>Id.</u>
(quoting <u>United States v. Feliciano</u>, 223 F.3d 102, 111 (2d Cir.
2000); further quotation omitted; brackets in original). Thus, even
when a prosecutor elicits testimony he "knows or should know to be
false, or allows such testimony to go uncorrected, a showing of
prejudice is required." <u>Id.</u> at 126-27. In such cases, "the
conviction must be set aside unless there is no 'reasonable
likelihood that the false testimony could have affected the
judgment of the jury.'" <u>Id.</u> at 127 (quoting <u>United States v. Agurs</u>,
427 U.S. 97, 103 (1976); and citing <u>Giglio v. United States</u>, 405
U.S. 150, 154 (1972); other citation omitted).

### 1.  Morrow's Allegedly False Testimony

According to Petitioner, ADA Cooper encouraged Morrow to
testify falsely when he asked him the following leading question at
Petitioner's trial (which occurred before Morrow's sentencing
hearing):  "And according to federal law you're locked into a
specific sentence, is that not true?" T.165. Morrow replied, "Yes."
T.165. ADA Cooper, however, had been copied on the letter from
Morrow's defense counsel to AUSA Buscaglia discussing the downward
departure motion AUSA Buscaglia had promised to make on Morrow's
behalf if Morrow provided substantially useful information pursuant

-38-

to the cooperation agreement. Petitioner asserts that after ADA Cooper elicited this inaccurate testimony, he improperly allowed it to stand uncorrected. The Court notes, however, that on cross-examination, Morrow admitted that he had not yet been sentenced.

The § 440 court found that because Petitioner had "failed to substantiate that the District Attorney had actual or constructive knowledge of . . . Morrow's agreement with the federal prosecutor, the [prosecution] cannot be made responsible for Morrow's false testimony or misstatements, if any, regarding that agreement." First C.P.L. § 440.10 Motion at 7. As noted above, this factual determination is entitled to a presumption of correctness which only may be rebutted by clear and convincing evidence. This Petitioner has not done.

Even assuming that Petitioner established that the prosecution either sponsored or failed to correct false testimony, he must then show the materiality of the false testimony–that it "could in any reasonable likelihood have affected the judgment of the jury." Giglio, 405 U.S. at 154 (citations omitted).

Impeachment evidence has been held to be "material" "if the witness whose testimony is attacked 'supplied the only evidence linking defendant(s) to the crime,'" United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (quoting United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987)). Similarly, nondisclosed impeachment evidence has been found to be "material" "'where the likely impact

-39-

on the witness's credibility would have undermined a critical element of the prosecution's case[,]'" Id. (quoting United States v. Payne, 63 F.3d at 1210; citing United States v. Badalamente, 507 F.2d 12, 17-18 (2d Cir. 1974) (nondisclosure of "hysterical" letters was material because letters would have had "powerful adverse effect" on witness's credibility, and credibility was "crucial to the determination of [the defendant's] guilt or innocence"), cert. denied, 421 U.S. 911 (1975)).

This is not a case where the conviction depended on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination. See Wong, 78 F.3d at 82 ("[N]ew impeachment evidence may satisfy the 'reasonable likelihood' standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination.") (citations omitted). Petitioner characterizes Morrow's testimony as "extremely damaging" testimony because Morrow described the argument which preceded the shooting involving Sell and Webb, and thereby established a motive for the crime. However, Morrow was not the only individual who described that altercation. Webb, who was the person whom Sell almost struck with his car, also testified about the incident. Williams, who was walking with Webb, fully corroborated Webb's story about the car-kicking incident and ensuing altercation with Sell, in which Sell threatened, "I'll be right back." Petitioner

-40-

also notes that Morrow observed Sell firing a gun towards the top of the house at 29 Boehm. However, by the time Morrow arrived at the scene, Newkirk was already on the ground; Morrow thus did not see Petitioner firing at Newkirk. Furthermore, there were a number of other individuals besides Morrow who identified Petitioner as the shooter and actually saw him fire at Newkirk. Under these circumstances, even assuming Morrow gave false testimony, which the prosecutor failed to correct, it would not have affected the result. See Wong, 78 F.3d at 82 ("[W]here independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial.") (citing United States v. Reyes, 49 F.3d 63, 68 (2d Cir. 1995) (where government agent subsequently discovered to have perjured himself, new trial not warranted where "core of the evidence" came from a different witness)).

### 3.  Maston's Allegedly False Testimony

Petitioner contends that Maston testified falsely by denying, on cross-examination, that he would receive any benefit in exchange for his testimony. As discussed above, however, this Court has concluded that Petitioner has not come forward with clear and convincing evidence to overcome the presumption of correctness afforded the C.P.L. § 440.10 court's finding that Maston and the ECDAO had not entered into a quid pro quo agreement at the time Maston testified at trial. The Court necessarily also concludes

that Petitioner is unable to prove that Maston testified falsely when he denied that he would receive any consideration or benefit in exchange for his testimony against Petitioner. Therefore, this claim cannot provide a basis for habeas relief.

**F.   Ground Six:  Defective Grand Jury Proceedings**

Petitioner asserts that the grand jury process was undermined by the prosecutor in connection with the testimony of Detective Andrew Streicher, an evidence technician with the Buffalo Police Department. This claim does not present a cognizable habeas claim, as discussed below.

In Lopez v. Reilly, 865 F.2d 30 (2d Cir. 1989), the Second Circuit relied upon United States v. Mechanik, 475 U.S. 66 (1986), to conclude that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court." 865 F.2d at 32 (citing Mechanik, 475 U.S. at 70). Under the authority of Lopez, Petitioner's claim concerning alleged misconduct by the prosecutor at the grand jury must be dismissed as not cognizable on federal habeas review. See, e.g., Jones v. Keane, 250 F. Supp.2d 217, 236 (W.D.N.Y. 2002) (dismissing as non-cognizable  habeas claim that the prosecutor improperly cross-examined a witness at the grand jury).

### G.     Ground Seven: Illegal Amendment of the Indictment

Petitioner claims that the prosecution unlawfully amended the indictment to include a theory of accomplice liability. This contention does not present a cognizable Federal constitutional question and is, in any event, without merit.

The Fourteenth Amendment's due process clause, as applied to the States, requires that "[a] defendant is entitled to fair notice of the charges against him." LanFranco v. Murray, 313 F.3d 112, 119 (2d Cir. 2002). A defendant must be given notice of the "core of criminality to be proven at trial". United States v. Wozniak, 126 F.3d 105, 110 (2d Cir. 1997) (citation omitted). The theory of liability is not a material or essential element of the offense charged upon which the jury will determine guilt, and there is no distinction under New York law between criminal liability as a principal or as an accomplice. People v. Rivera, 646 N.E.2d 1098, 1099 (N.Y. 1995); N.Y. PENAL LAW § 20.00. Since there is no legal distinction between liability as a principal or criminal culpability as an accomplice, it cannot be said that Petitioner failed to receive adequate notice of his potential liability as an accomplice under the indictment. See, e.g., Chandler v. Moscicki, 253 F. Supp.2d 478, 486-88 (W.D.N.Y. 2003).

## IV.  Conclusion

For the reasons stated above, David Sell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the

petition (Docket #1) is dismissed. The Court declines to grant a certificate of appealability because it finds that Petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

   **IT IS SO ORDERED.**


                                    S/Michael A. Telesca

                          _____
                               HON. MICHAEL A. TELESCA
                             United States District Judge

DATED:     June 16, 2014
           Rochester, New York